Weight, J.,
delivered the opinion of the court:
The effect of the findings of fact by the court discloses, in substance, that claimant’s testator was, June 2,1863, appointed by the President provost-marshal for the First Congressional district of Missouri, with the rank of captain of cavalry. While acting as such provost-marshal the deceased received, from numerous drafted men and from their brokers, various sums of monej'- upon the express trust that when a substitute should be tendered by the man who made the the deposit, and should be accepted and enrolled, the deposit should be paid to the substitute, and if no substitute was accepted the money should be returned to the conscript. These several sums of *334 money were received by Colman without express authority of the Government, and he assumed to act in his individual capacity and responsibility in that regard, and it appears this practice arose at the request or suggestion of the drafted men and their agents. Colman at first declined to receive these deposits, insisting that it was not his official duty- to do so, and it is now contended by his widow that he received them only in his private relation and was accountable only to the persons who deposited the money.
The Secretary of War had, by regulation made June 30, 1863, fixed the sum of $300 as commutation for a draft, but it does not appear that Colman was authorized by that officer to receive such money for procuration of substitutes.
February 10, 1865, the provost-marshal-general sent a detachment of soldiers with a commissioned officer to the bank at St. Louis with orders to seize a package of money there deposited by Colman, which they did, and took it to the provost-marshal-general’s office at St. Louis, who afterwards gave to Colman a receipt for the same as containing $30,049, which sum was duly accounted for by the paymaster to whom it was delivered as merged into other moneys and used in the payment of troops during the year 1865. Charges having-been preferred against Captain Colman, he was, in Mhy, 1865, tried at St. Louis before a general court-martial, duly organized, and convicted of several offenses, they being somewhat varied in. their nature, among which were falsifying his accounts, conduct unbecoming an officer and a gentleman, disobedience to orders, and embezzlement. The charge of embezzlement, of which he was convicted, consisted in the alleged conversion to-his own use of a sum of money deposited with him by drafted men for the purpose of procuring their substitutes in the military service of the United States. The court-martial found the amount of money embezzled of the substitute fund was $18,963. The balance of the money taken is not referred to in the findings of the court-martial, and, so far as it appears, presumptively belonged to Colman, or possibly his clients, he having been a lawyer prior to and at the time of his appointment as provost-marshal.
There is nothing in the evidence, other than the findings of the court-martial, to indicate that the $18,963, or any other *335 part of the money taken, was a substitute fund deposited wiffi Colman. The sentence of the court-martial was, in effect, that the accused be dishonorably dismissed from the service; to forfeit all pay and allowances; to be compelled to turn over to such officer as the general commanding should designate $18,963; to pay a fine of $700 to the United States, and be imprisoned for the period of seven months at such place as the general commanding should designate,'and thereafter until said fine was paid and said sum of money turned over; that the crimes of which the accused was found guilty, his name, place of abode, and punishment be published, after which it should be-deemed scandalous for any officer to associate with him. This finding and sentence were approved bjr the general commanding (Dodge), and the sum mentioned ordered to be paid to the chief paymaster of the department, and the penitentiary at Jeffei'son City, Mo., was designated as the place of imprisonment, where he was confined for the period of seven months, and, April 28, 1866, upon habeas corpus proceedings in the United States Circuit Court for the district of Missouri, upon a finding of payment of the fine before mentioned, was discharged from further imprisonment. Subsequently, March 3,1869, Colman applied to the President for a removal of the disabilities imposed by the sentence of the court-martial, and this was at first granted, but later, Marchl3,1869, upon the recommendation of General Sherman, the order of March 3 was, by the order of the President, rescinded.
It is argued by the claimant that the officer received the substitute money in his private capacity, and that for such reason the authorities of the Government wrongfully deprived him of its possession and it is legally bound to make restitution. If the money had been paid to the officer by the drafted men in reliance upon the officer as a private citizen, we concede that the argument should prevail, but the facts of' the record before us, in the light of the circumstances existing during the time of the war with reference to the enforcement of the draft, can not be considered and given their proper weight and due influence without reaching the irresistible conclusion that but for the official station conferred upon him by authority of the Government, Colman would have received *336 none of the money he later converted to his own use. It is unreasonable to believe that conscripts would have sought out Colman in his private capacity and deposited with him their money with which to procure substitutes, and it is but natural to believe they paid it to him on the faith and confidence of his being the officer of the United States having supervision of the draft, and of his duties that required him to enforce the law in that respect. It is almost impossible for the human mind not to be impressed with the conviction that a drafted person, influenced by the powers and surroundings of a provost-marshal, would not be controlled by a mental coercion to do as these conscripts did, and pay their money to the officer in charge, hoping thereby to gain advantage not to be otherwise attained. Force mayr, we think, be added to this Anew by reference to the provisions of section 13 of the act of March 13, 1863, for enrolling and calling out the national forces, and for other purposes (12 Stat. L., 733), where it is permitted to a drafted person to furnish an acceptable substitute to take his place in the draft, or he may pay" to such person as the Secretary of War may" authorize to receive it, such sum, not exceeding $300, as the Secretary may determine, for the procuration of such substitute, which sum shall be fixed at a uniform rate by a general order made at the time of ordering a draft for any State or Territory; and thereupon such person furnishing the substitute, or paying the moneys, shall be discharged from further liability under the draft.
True, it does not appear that Colman was authorized by" the Secretary of War to receive the money as provided by. the statute referred to, but by the course of conduct adopted by Colman, he having received and paid out more than a million dollars; he gave to himself the appearance of a person having such authority, and thereby tended to mislead persons having-business of that nature. It is, we think, a familiar rule of the law relative to principal and agent that where the latter exceeds the authority" given by the former, giving himself the appearance of representing the principal, the principal may assume or ratify" the acts of the agent, becoming thereby responsible for the same.
*337 In tbe present case, as we have seen, it was lawful to confer upon the officer authority to receive the deposits he did receive, and it was therefore proper to'ratify what he did in that respect without authority. The act of the military authorities in seizing the money, followed by the court-martial, its sentence and execution thereof, was effective as such ratification, and the Government thereafter became, and is 3’et, the trustee of such substitute fund as rightfully as if the statute to which we have referred had been strictly complied with.
There is no legal principle upon which the claimant could recover the money embezzled by1 the officer, and to permit her to do so would be contrary to good morals. The officer obtained the money only upon the faith of the office conferred upon him by the Government. In his relations with others, and in his dealings with persons, so far as they were influenced by the official position of the officer, and in respect to conduct that would or could not be undertaken but for his official station, the Government was morally bound by and ought legally to be responsible for his acts. By this means the officer obtained a sum of money and converted it to his own use, in consequence of which the authorities of the Government seized and took it away, and he was afterwards convicted and sentenced for the offense. This money never belonged to him and does not now, and to permit his personal representatives to recover it under the circumstances would be a shock to morality.
Over and above all this, however, nothing appears in the record to dispute the cognizance of the charges made before the court-martial, and jurisdiction of the person of the officer, and therefore its sentence is valid when questioned collaterally, although irregularities or errors are alleged to have occurred in its proceedings. (Keyes v. The United States, 109 U. S., 336.) We are of the opinion the findings and sentence of the court-martial are valid and binding upon Colman and his personal representatives.
It follows from the foregoing views that we are of the opinion the claimant as widow and sole legatee can not recover of the United States the $18,963, substitute fund the court- *338 martial found the officer had embezzled, but the United States having no right or claim to the residue of the money seized, she is entitled to a judgment for 111,086.